UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN BRODER,

        Plaintiff,

                               CASE NO. 03-CV-75106-GER-PJK
                               JUDGE NANCY G. EDMUNDS
                               MAGISTRATE JUDGE PAUL J. KOMIVES

  v.

CORRECTIONAL MEDICAL
SERVICES, INC., et al.

        Defendants.

_____/

**REPORT AND RECOMMENDATION REGARDING MATHAI AND HUTCHINSON'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT (Doc. Ent. 79)**

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.     Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
          1.     The original complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
          2.     Defendant CMS's motion to dismiss and plaintiff's motion to compel . . . . . . . . . . . . . 3
          3.     Defendants Epp, Caruso and Pramstaller's motion for leave to amend answer . . . . . . . . 4
          4.     The amended complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     B.     The CMS Defendants' Dispositive Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     C.     Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
          1.     Fed. R. Civ. P. 12 ("Defenses and Objections") . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
          2.     Fed. R. Civ. P. 56 ("Summary Judgment") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
     D.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
          1.     Factual history . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
          2.     As an initial matter, the Court should dismiss plaintiff's state law claims for gross
                negligence, reckless indifference, and willful and wanton misconduct. . . . . . . . . . . . . 20
          3.     The Court should conclude that plaintiff's Eighth Amendment claims against the CMS
                defendants survive summary judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
          4.     The Court should conclude that plaintiff's negligence and medical malpractice claim
                against Mathai survive summary judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
               a.     Defendants are not entitled to summary judgment on their procedural challenges
                      to plaintiff's medical malpractice claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
               b.     Defendants are not entitled to summary judgment on their claim that plaintiff has
                      not complied with Section 600.2912a(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
               c.     Defendants are not entitled to summary judgment on their substantive challenge
                      to plaintiff's medical malpractice claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**I.    RECOMMENDATION:** The Court should grant in part and deny in part defendants Mathai and Hutchinson's motion to dismiss and/or for summary judgment.  Doc. Ent. 79.

**II.    REPORT:**

**A.    Procedural History**

**1.    The original complaint**

Plaintiff is currently incarcerated at Parnall Correctional Facility (SMT) in Jackson, Michigan.  He filed a notice of intent (NOI) under Michigan's medical malpractice statute on April 29, 2003.  Doc. Ent. 79-12, Doc. Ent. 86 Ex. S.

On December 24, 2003, plaintiff filed a complaint against defendants Patricia L. Caruso, the director of the Michigan Department of Corrections (MDOC); George Pramstaller, D.O., described as the MDOC's chief medical officer; Henry Grayson, described as the warden at SMT; Jan Epps, B.S.N., R.N., described as the regional health care administrator; Correctional Medical Services (CMS), described as a for-profit corporation licensed to do business in Michigan; and Audberto Antonini, M.D., Benzi Mathai, M.D., Bey, M.D., Malcolm Trimble, M.D., John Axelson, M.D., and Ray H. Clark, M.D., described as agents or employees of CMS. Doc. Ent. 3 at 2-3 ¶¶ 6-16.  Along with his complaint, plaintiff filed affidavits of merit dated December 9 and December 12, 2003.  Doc. Ent. 3 at 15-18, 19-22.

Plaintiff's claims include a 42 U.S.C. § 1983 Eighth Amendment claim of deliberate indifference to serious medical needs; as well as state law claims of gross negligence, reckless indifference, and willful and wanton misconduct; and negligence and medical malpractice. Comp. at 8-13 ¶¶ 91-129.  Plaintiff seeks compensatory, exemplary, and punitive damages; declaratory, equitable, and injunctive relief; and costs, attorney fees, and any other relief the Court deems appropriate.  Doc. Ent. 3 at 13-14.  Plaintiff has been granted in forma pauperis

status, and he is represented by the Michigan Clinical Law Program.  Doc. Ent. 2, Doc. Ent. 3 at

1.[1]

Defendants Caruso, Pramstaller, Grayson, and Epp filed an answer to the complaint on

April 22, 2004.  Doc. Ent. 16.  On October 18, 2004, defendants Mathai and Antonini filed an

answer to the complaint.  Doc. Ent. 41.

**2.      Defendant CMS's motion to dismiss and plaintiff's motion to compel**

On February 24, 2004, defendant CMS filed a motion to dismiss.  Doc. Ent. 8.  Defendant

argued that "plaintiff['s] complaint must be dismissed for failure to comply with 42 U.S.C. §

1997e(a)[,]" and "the Court should decline supplemental jurisdiction over plaintiff's pendant

state law claims pursuant to 28 U.S.C. § 1367(a)."  Doc. Ent. 8 at I.  On June 29, 2004, plaintiff

filed a motion to compel answers to discovery requests as to defendants CMS, Antonini,

Axelson, Trimble, Bey, Mathai, and Clark.  Doc. Ent. 20.

On August 9, 2004, I entered a report and recommendation.  Doc. Ent. 21.  First, I

recommended that the Court grant in part and deny in part defendant CMS's motion to dismiss.

Specifically, I recommended that the motion to dismiss be denied to the extent it sought

dismissal of claims against CMS to the extent they were supported by plaintiff's second

grievance and to the extent it sought dismissal of plaintiff's state law claims.  Second, I

recommended that if the Court agreed with my recommendation, it should grant plaintiff's

motion to compel discovery, but only to the extent it sought documents from defendant CMS.

Finally, I recommended that the Court enter an order requiring plaintiff to show cause why the

---

[1]Judge Rosen has referred this case to me to conduct all
pretrial proceedings.  Doc. Ent. 5.

complaint against the unserved defendants (Antonini, Axelson, Trimble, Bey, Mathai, Clark, and Grayson) should not be dismissed for failure to comply with Fed. R. Civ. P. 4(m).

On September 22, 2004, Judge Rosen entered an order (1) accepting in part and rejecting in part my report and recommendation; (2) granting CMS's motion to dismiss and dismissing with prejudice plaintiff's claims against CMS; (3) extending the summonses in this case for thirty (30) days so that plaintiff might effectuate service upon Antonini, Axelson, Trimble, Bey, Mathai and Clark and (4) denying without prejudice plaintiff's motion to compel as to the individual CMS defendants.

**3.     Defendants Epp, Caruso and Pramstaller's motion for leave to amend answer**

On September 7, 2004, between the filing of my report and recommendation and Judge Rosen's order regarding that filing, defendants Epp, Caruso and Pramstaller filed a motion for leave to amend their April 22, 2004 answer, in part because it had erroneously been filed on behalf of Grayson.  Doc. Ent. 30.  On the same date, these three defendants filed a first amended answer (dated September 2, 2004).  Doc. Ent. 28.

On November 9, 2004, I entered an order granting this motion and accepting the September 2, 2004, document for filing.  Doc. Ent. 45.

**4.     The amended complaint**

On October 1, 2004, plaintiff filed a motion for leave to amend complaint in order to dismiss several defendants and to add defendant Hutchinson.  Doc. Ent. 36.  I granted this motion on October 20, 2004.  Doc. Ent. 43.  On December 6, 2004, no amended complaint having been filed with the Court, I entered an order requiring plaintiff to show cause why his case should not be dismissed for failure to prosecute.  Doc. Ent. 47.

Plaintiff responded on December 13, 2004, citing a clerical error. Doc. Ent. 48. On December 13, 2004, plaintiff filed an amended complaint[2] against Caruso, Pramstaller, Grayson, Epps, Hutchinson, Antonini and Mathai. Doc. Ent. 49. In his own words, the crux of this complaint is that "defendants were deliberately indifferent to his serious medical needs by failing to timely diagnose and treat his laryngeal cancer, in violation of the Eighth Amendment to the United States Constitution[.]" Doc. Ent. 49 ¶ 3

Plaintiff's legal claims are denominated as (I) 42 U.S.C. § 1983; (II) gross negligence, reckless indifference, and willful and wanton misconduct and (III) negligence and medical malpractice. On December 30, 2004, defendants Hutchinson, Antonini and Mathai filed an answer to the first amended complaint, as well as affirmative defenses. Doc. Ent. 50 at 1-15, 42-46.

On November 16, 2005, I entered an order which in part set the deadline for discovery for January 15, 2006. Doc. Ent. 68. I twice ordered sixty (60) day extensions to these dates. Doc. Entries 69 & 71. Eventually, defendants Caruso, Pramstaller and Epps deadline to file a dispositive motion was set for December 15, 2006. Doc. Ent. 82.

On September 27, 2006, a stipulation to dismiss Grayson was filed, and Judge Edmunds[3] has entered an order dismissing Grayson pursuant to the stipulation. Doc. Entries 76 & 99. On January 29, 2007, I signed a stipulation and order dismissing defendant Antonini with prejudice.

---

[2]This document is originally dated September 30, 2004, the same date that appears on plaintiff's October 1, 2004 motion to amend the complaint.

[3]On August 17, 2007, Judge Rosen entered an order of disqualification, and the case was reassigned to Judge Edmunds. Doc. Ent. 98.

Doc. Ent. 93. Therefore, the only remaining defendants are Caruso, Pramstaller and Epps (hereinafter referred to as "the MDOC defendants") and Hutchinson and Mathai (hereinafter referred to as "the CMS defendants").

**B.      The CMS Defendants' Dispositive Motion**

On November 30, 2006, the CMS defendants filed a motion to dismiss and/or for summary judgment in which they set forth the following main arguments:

I.      Defendants Mathai and Hutchinson were not deliberately indifferent to plaintiff's serious medical needs, therefore plaintiff's claim pursuant to 42 [U.S.C. §] 1983 must be dismissed pursuant to [Fed. R. Civ. P.] 56.

II.      Plaintiff fails to state a claim against defendants Mathai and/or Hutchinson for negligence, gross negligence, "Reckless indifference,' and/or willful and wanton misconduct, upon which relief may be granted.

III.      Plaintiff's amended complaint fails to state a claim for medical malpractice upon which relief may be granted and must be dismissed pursuant to [Fed. R. Civ. P.] 12(b)(6).

IV.      Defendant Dr. Mathai is entitled to summary judgment concerning plaintiff's medical malpractice claim pursuant to [Fed. R. Civ. P.] 56 because plaintiff's experts admit there was no delay by Dr. Mathai.

Doc. Ent. 79.

On December 20, 2006, plaintiff filed a response to the motion. Doc. Ent. 84. Plaintiff argues that (I) "the primary care physician's late diagnosis and treatment of the plaintiff's throat cancer violate[d] the Eighth Amendment and the Michigan medical malpractice act[;]" (II) "Correctional Medical Services' policies and procedures, as implemented by its state medical director, violate[d] the Eighth Amendment[;]" (III) "there are genuine issues of material fact as to both [of these questions][;]" and (IV) "the plaintiff [has] complied with the state medical malpractice act[.]"[4] Doc. Ent. 84 at 3.[5]

_____

[4]In support of his response, plaintiff has filed exhibits A-U. Doc. Entries 84, 85, 86 & 89. On January 2, 2007, plaintiff filed the December 19, 2006 declarations of Bradford and Williams

**6**

**C.      Applicable Law**

**1.      Fed. R. Civ. P. 12 ("Defenses and Objections")**

Federal Rule of Civil Procedure 12 sets forth rules regarding defenses and objections.  As to how defenses and objections should be presented, the rule states in pertinent part:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:  . . . (6) failure to state a claim upon which relief can be granted[.]

Federal Rules of Civil Procedure 12(b)(6).  "If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(b).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-1965 (2007) (citations and quotations omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint

---

regarding their expert reports.  Doc. Entries 89-2, 89-3.

[5]Also pending before the Court is the MDOC defendants' December 20, 2006, motion to dismiss.  Doc. Ent. 87.  I will address this motion in a separate report and recommendation.

are true[.]" *Bell Atlantic Corp.*, 127 S. Ct. at 1965 (citations and quotations omitted). It is not enough that "the pleadings [leave] open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Id*. at 1968. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 1970. "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 1974. Claims should be "nudged . . . across the line from conceivable to plausible" to avoid dismissal. *Id.*

The reviewing court must construe the complaint in the light most favorable to plaintiff and must presume all factual allegations in the complaint as true. *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). The purpose of Rule 12(b)(6) is to give defendant the opportunity to test whether plaintiff is entitled to legal relief as a matter of law even if everything alleged in the complaint is true. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). A dismissal under Rule 12(b)(6) is generally disfavored by courts, as it is a dismissal on the merits. 2A JAMES W. MOORE, MOORE'S FEDERAL PRACTICE ¶ 12.07 (2d ed. 1995).

**2.      Fed. R. Civ. P. 56 ("Summary Judgment")**

Summary judgment, pursuant to Fed. R. Civ. P. 56, may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties.

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis,* 542 P.2d 867, 872 (Wyo. 1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)). "In evaluating a motion for summary judgment we view all evidence in the light most favorable to Plaintiff . . . and assess the proof to determine whether there is a genuine need for trial." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998) (citations omitted).[6]

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party discharges that burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine triable issue. Fed. R. Civ. P. 56(e); *Gregg*, 801 F.2d at 861.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his pleading, Fed. R. Civ. P. 56(e), a verified complaint . . . satisfies the burden of the nonmovant to respond." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999). "[A] verified complaint . . . would have the same force and effect as an affidavit and would give rise to genuine issues of material fact." *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992). However, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to

_____

[6]The Sixth Circuit cited both *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) in support of this statement.

the matters stated therein." Fed. R. Civ. P. 56(e). *See also Hamilton v. Roberts*, No. 97-1696, 1998 WL 639158, *5 (6th Cir. Sept. 10, 1998) (unpublished) (personal knowledge required); *Daniel v. Cox*, No. 96-5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (unpublished) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)) (cannot consider hearsay evidence).

"Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient." *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992), citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 246-250 (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a). *Anderson*, 477 U.S. at 250. Consequently, a non-movant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

**D.      Analysis**

**1.      Factual history**

The factual allegations in plaintiff's amended complaint span the period from Spring 2001 through April 17, 2003. Doc. Ent. 49 at ¶¶ 19-86. Each of the parties provides a lengthy

recitation of the operative facts in the motion papers. Doc. Ent. 84 at 9-22, Doc. Ent. 79 at 14-25. Unless otherwise noted, all references to exhibits in this section are those which accompanied plaintiff's response. Doc. Entries 84, 85, 86 & 89 (Exhibits A-U).

On May 4, 2001, plaintiff was seen by Mathai and complained of a sore throat. Mathai recommended warm gargles twice daily and that plaintiff return in one month. Ex. C at 19, 21. On May 21, 2001 and June 26, 2001, the nursing staff gave plaintiff 30 day supplies of Motrin 600 mg in response to kites. Doc. Ent. 79 Ex. A-1 at 57-58, 318. By June 28, 2001, plaintiff was off of kosher diet line and on the regular diet line. Ex. C at 18, 21.

On July 11, 2001, RN Don Smith conducted plaintiff's annual health screen during which it was noted that plaintiff had experienced a cold/sinus infection for 2-3 weeks. Ex. C at 18, 21; Ex. D at 3. Although there is a notation that plaintiff complained of a cough lasting more than three weeks, there is no indication that he was referred to an MSP. Ex. D at 3.

On August 3, 2001, plaintiff's doctor appointment was cancelled. Ex. C at 17, 21. On August 18, 2001, plaintiff wrote to SMT health care seeking the status of his request for medical service. Ex. E at 1. On August 20, 2001, Mathai ordered a CBC, blood pressure monitoring and Drixoral. Doc. Ent. 79 Ex. A-1 at 56, A-2 at 321. On August 22, 24 & 28, 2001, plaintiff's blood pressure was monitored. On two of these visits, he complained of a sore throat. Ex. C at 16. On August 29, 2001, Mathai reviewed plaintiff's CBC results and ordered a repeat CBC. Doc. Ent. 84 Ex. A-1 at 55.

On August 31 and September 4, 2001, plaintiff's blood pressure was monitored, and he mentioned a sore throat during both of these visits. Ex. C at 16, 22. On August 31, plaintiff completed a Health Care Request form noting that "it has become difficult and painful to

swallow." Ex. E at 2. On the same day he completed a Step I grievance form. Ex. E at 3. On September 5, 2001, MSP Chien noted that plaintiff's throat was red. Ex. C at 15, 22. On September 11, 2001, Mathai noted in plaintiff's chart that she would reassess him in one month. Ex. C at 15, 22.

On September 23, 2001, plaintiff wrote to Pramstaller mentioning his throat pain and difficulty with swallowing. Ex. E at 4. From October 1 through October 21, 2001, Mathai was on vacation leave. Doc. Ent. 79 at 16. On October 12, 2001, plaintiff saw Antonini, who suspected laryngeal / esophageal cancer. Ex. C at 13-14, 22. That day, Antonini ordered a barium swallow, a chest x-ray and blood work. Antonini also completed CMS authorization requests for ear, nose & throat and gastrointestinal consultations. These requests were approved on November 13th and November 19th, respectively. Ex. D at 9-11.

According to plaintiff, the barium swallow was scheduled for October 19, 2001, was postponed until October 31, 2001, and was again delayed "because of equipment failures or supply shortages at the facility." Ex. 84 at 14, Ex. E at 5. On November 1, 2001, Mathai noted that plaintiff was being evaluated for weight loss. Ex. C at 12, 23. On November 2, 2001, CMS approved Antonini's request for an ENT consultation. The appointment was scheduled for November 13, 2001. Doc. Ent. 79 Ex. A-2 at 200.

On November 3, 2001, plaintiff completed a Step I grievance form. Ex. E at 5-6. According to plaintiff, x-rays were performed on November 4, 2001 and the barium swallow and chest x-ray were performed on November 6, 2001. Doc. Ent. 49 ¶ 33; Doc. Ent. 84 at 15. In a November 13, 2001, clinic consultation, Kornak (ENT) noted lesions on both vocal cords and stated, "we need to do a microlaryngoscopy with cord stripping to examine him at Foote

Hospital under general anesthesia as an outpatient." Ex. D at 15. On November 14, 2001, Mathai signed Kornak's specialty consult report recommending that the microlaryngoscopy take place within 2-3 weeks. Ex. D at 16. It was faxed to CMS on November 16, 2001. Doc. Ent. 79 at 17.

On November 16, 2001, Mathai signed the November 14, 2001 report of plaintiff's CBC results, which indicated a high white blood count. Ex. D at 17. On November 19, 2001, plaintiff saw Sharma (GI). Ex. C at 10, Ex. E at 8, 12. On November 20, 2001, Mathai signed Kornak's consultation. Ex. D at 15. On November 26, 2001, Kornak's specialty consult report was faxed to CMS. Ex. D at 16.

Mathai's November 26 & 28, 2001 notes indicate, among other things, that plaintiff was "being evaluated for any GI cancers[,]" and that an EGD was pending. Ex. C at 10, 23-24. On November 29, 2001, Mathai signed an offsite speciality referral 30 day followup form. Ex. D at 21. On December 5, 2001, CMS approved the microlaryngoscopy. Ex. D at 22. On December 7, 2001, the authorization was faxed to MDOC Patient Services. Doc. Ent. 79 at17. The procedure was scheduled for January 11, 2002. Doc. Ent. 79 at A-2 at 193.

On December 6, 2001, Pramstaller responded to plaintiff's September 23, 2001 letter. Ex. E at 7. The Step I grievance response to SMT-01-11-01478-12D was dated December 8, 2001 and noted plaintiff's November 13, 2001 visit with Kornak and November 19, 2001 visit with Sharma. Ex. E at 8. Plaintiff's December 3, 2001 Step II appeal of SMT-01-11-01478-12D was received on December 4, 2001. Ex. E at 9-10.

On December 12, 2001, Mathai signed the December 10, 2001, report of plaintiff's CBC results. Ex. D at 23. Plaintiff was interviewed by Nursing Supervisor Lee on December 12 or

17, 2001 regarding his November 3, 2001 grievance. Doc. Ent. 84 at 17; Ex. E at 8, 12. On or about December 25, 2001, plaintiff completed a Step III grievance appeal. Ex. E at 13-14.

On January 2, 2002, Mathai noted plaintiff's blood pressure in his medical chart. Ex. C at 9, 24. On the same day, Mathai signed an offsite speciality referral 30 day followup form, which noted that plaintiff was scheduled for vocal cord stripping on January 11, 2002 and that the EGD was pending. Ex. D at 24. On January 11, 2002, plaintiff was admitted to Foote Hospital for microlaryngoscopy and cord stripping. Ex. D at 25-26. Kornak performed the procedure. Ex. D at 46. Devaney's surgical pathology report notes "[i]nvasive and in-situ moderately differentiated keratinizing squamous carcinoma." Ex. D at 28-29.

On January 14, 2002, "lab tests confirmed that [plaintiff] had a malignant tumor on his larynx." Doc. Ent. 49 ¶ 45. He was diagnosed with "Stage I invasive and in-situ moderately differentiated keratinizing squamous carcinoma on his left vocal cord." Doc. Ent. 49 ¶ 47. On January 16, 2002, Mathai reviewed Kornak's January 11, 2002 specialty consult report. Apparently, the report was faxed to CMS the following day. Doc. Ent. 79 Ex. A-2 at 192.

Kornak's January 22, 2002 clinic consultation notes that "the patient needs to go to radiotherapy for treatment planning. We will see him after his radiation therapy." Ex. D at 30. The same day, Kornak completed a specialty consult report for referral to radiation / oncology at Foote. Plaintiff was approved for a radiation / oncology consult the same day, and an appointment was scheduled for February 5, 2002. Ex. D at 31. Plaintiff claims that he was informed by Kornak on January 22, 2002 he had Stage I laryngeal cancer. Doc. Ent. 49 ¶ 50.

On January 24, 2002, Epp responded to plaintiff's Step II grievance appeal. Ex. E at 10, 12. On the same day, plaintiff wrote to SMT health care and included a copy of an authorization

to release medical file information. Doc. Ent. 79 Ex. A-2 at 284. On January 27, 2002, plaintiff wrote to the Office of the MDOC Director regarding his December 25, 2001 Step III grievance appeal in SMT-01-11-01478-12d. Ex. E at 13.

On January 28, 2002, plaintiff completed a health care request form stating that he had not been advised regarding treatments. On January 29, 2002, a nurse replied that plaintiff's treatment had been approved, a date was not yet set, but treatment would be scheduled soon. Ex. E at 15.

On January 30, 2002, Mathai called patient services and left a message to schedule plaintiff's radiation appointment for that week and noted that plaintiff should return to the clinic in three weeks. Ex. C at 7. On the same day, Mathai completed an off formulary medication request for Ultram. Ex. D at 35. She also completed physician's orders for Ultram, resource, and dietary consult. Ex. D at 36. Furthermore, she signed Kornak's January 22, 2002 specialty consult report. Ex. D at 34.

On February 4, 2002, plaintiff completed a health care request form stating that he was still waiting for his radiation treatments. On February 5, 2002, a nurse replied that Mathai had requested that radiation treatments begin (and an appointment was scheduled for that day) and pain medication be approved. The reply also noted that plaintiff's resource was available in the pill line. Ex. E at 16. Also on February 5, 2002, Epp's January 24, 2002 Step II grievance response was returned to plaintiff. Ex. E at 10.

On February 5, 2002, plaintiff was admitted to Foote Hospital for a radiation / oncology consultation. Ex. D at 42. The U of M radiation oncologist's (Dr. James Hayman)[7] report notes,

_____

[7]Defendants claim that Hayman was covering for Tsien and that both are radiation oncologists at U of M Hospital. Doc.

"[a]ssuming that the patient does in fact have a stage I larynx cancer we would recommend treatment with radiation therapy to be given with curative intent." Ex. D at 43. It further notes that "[a]rrangements will be made for the patient to return for treatment planning and to begin treatment soon thereafter." Ex. D at 44. Hayman completed a specialty consult report the same day, recommending a follow up visit in 1-2 weeks. Mathai signed the report on February 8, 2002, and the MDOC faxed it to CMS on February 11, 2002. Ex. D at 45; Doc. Ent. 79 at 20. On February 12, 2002, CMS approved radiation for seven weeks and simulation. Ex. D at 48.

On February 13, 2002, Tsien recommended a CT scan of the head and neck "ASAP." Doc. Ent. 79 Ex. A-2 at 188. On February 13, 2002, Foote Hospital oncologists submit a speciality consult report for a CT scan of the head and neck, "ASAP". Ex. D at 49, Doc. Ent. 84 at 20. CMS's February 12, 2002 authorization was faxed to MDOC Patient Services on February 19, 2002. Doc. Ent. 79 at 20. Patient services scheduled the simulation for treatment for March 12, 2002 and the radiation for March 19, 2002. Ex. D at 48.

On February 22, 2002, Mathai saw plaintiff but did not have his chart, because it was out for plaintiff's January 24, 2002, FOIA request. Ex. C at 6, 26; Doc. Ent. 79 at 21, Ex. A-2 at 284. On February 25, 2002, plaintiff completed a health care request form stating that his treatments had not begun that day. On February 26, 2002, a nurse noted that his radiation was to start the following week. Ex. D at 51; Doc. Ent. 49 ¶ 55. On February 28, 2002, Mathai signed Hayman's February 5, 2002 radiation oncology consultation. Ex. D at 52-54.

Mathai was on maternity leave from March 8 or March 9, 2002 to May 15, 2002. Doc. Ent. 79 at 21; Doc. Ent. 84 at 20. On March 8, 2002, Dr. Marcella Clark completed a CMS

Ent. 79 at 19.

authorization request for an "urgent" head and neck CT scan. Ex. D at 55. On March 12, 2002, plaintiff went to Foote Hospital for larynx cancer therapy planning. Ex. D at 61-62. Tsein performed the CT treatment and simulation. Doc. Ent. 79 Ex. A-1 at 169. The radiologist, Dr. Michael Shanks, noted that "[t]umor appears to involve the larynx on the left with extension into the epiglottis." Ex. D at 61-62. The CMS authorization request for the head and neck CT scan was faxed to CMS on March 13, 2002 and was approved the same day. Ex. D at 55, 64. On March 14, 2002 it was faxed to MDOC Patient Services. The head and neck CT scan was scheduled for April 1, 2002. Doc. Ent. 79 at 21. On March 18, 2002, Tsien completed a specialty consult report for a head and neck MRI. She noted it was urgent and marked the recommendation "*Stat*". Ex. D at 67. A diagnostic exam order form of the same date also lists the request for the head and neck MRI as "URGENT-ASAP". Ex. D at 68.

On March 21, 2002, Bey completed a specialty consult report noting that radiation treatment was to be rescheduled after plaintiff's MRI and that authorization for the MRI was still pending. Ex. D at 69. Bey also filled out a CMS authorization request for a neck MRI which was faxed to CMS that day. An appointment was scheduled for March 27, 2002. Ex. D at 69-71. On March 25, 2002, Bey completed a CMS authorization request for chemotherapy to begin March 28, 2002. It was faxed to CMS. CMS approved the request on March 26, 2002, and an appointment was scheduled for March 28, 2002. Ex. D at 73, 75.

On March 26, 2002, plaintiff completed a health care request seeking an explanation for why his treatments did not begin on March 19, 2002. On March 27, 2002, the nurse noted that plaintiff's treatment would begin soon. Ex. E at 17. On March 27, 2002, plaintiff was examined at Foote Hospital for cancer of the larynx with epiglottic and pharyngeal extension, at which

time an MRI of the neck was performed by radiologist Dr. James Heisel. Ex. D at 76, 81-82; Doc. Ent. 49 ¶ 58; Doc. Ent. 79 Ex. A-2 at 498-499.

On March 28, 2002, plaintiff saw Dr. John A. Axelson of the Duane L. Waters Hospital. Doc. Ent. 79 Ex. A-1 at 157. That same day, Axelson completed a hematology oncology specialty consult report, and it was faxed to CMS that day. On March 29, 2002, CMS approved the request for a consultation with Kornak. An appointment was scheduled for April 2, 2002. Bey signed the report on April 1, 2002. Ex. D at 79-80.

Plaintiff claims that by April 1, 2002, "his throat cancer had advanced from Stage I (the original January diagnosis) to Stage III T2N1." Doc. Ent. 49 ¶ 60. In an April 1, 2002, radiation oncology interval note, Tsien noted that plaintiff had "Stage III T2N1 squamous cell carcinoma of the left true vocal cord." Ex. D at 85. That same day, Axelson completed a specialty consult report. Plaintiff was approved to be admitted for chemotherapy, and his appointment was scheduled for April 2, 2002. Doc. Ent. 79 Ex. A-1 at 156. On April 2, 2002, plaintiff was admitted to Foote Hospital "for placement of PEG tube and starting of chemotherapy and radiation therapy." Doc. Ent. 79 Ex. A-2 at 391. On April 2, 2002, plaintiff's chemotherapy began. Doc. Ent. 49 ¶ 65.

On April 3, 2002, plaintiff's daily radiation treatment began. Doc. Ent. 49 ¶ 66. Kulkarni performed placement of a PEG tube. Ex. D at 88; Doc. Ent. 49 ¶ 70. On April 4, 2002, Dr. Booth performed a dental extraction. Ex. D at 88. This tooth loss allegedly caused a partial denture to fail in August 2002. Doc. Ent. 49 ¶ 71. On April 10, 2002, Kulkarni performed an incision and drainage of a PEG tube related abscess. Ex. D at 88.

On April 16, 2002, plaintiff was discharged from Foote Hospital. Ex. D at 88. His discharge diagnosis included (1) "[l]ocally advanced cancer of the larynx with regional extension and lymph node metastasis[;]" (2) "[m]alnutrition requiring PEG tube insertion for feeding[;]" and (3) "[c]arious teeth requiring extraction." His discharge medications included enteral feeding, Ancef, Ultram, nystatin, Neosporin and albuterol nebulized mist treatments. Ex. E at 89.

Plaintiff began his second course of chemotherapy on May 2, 2002. Doc. Ent. 49 ¶ 73. On May 20, 2002, Mathai saw plaintiff. Doc. Ent. 79 Ex. A-1 at 33. Plaintiff's daily radiation treatment ceased on May 23 or May 24, 2002. Doc. Ent. 49 ¶ 74; Doc. Ent. 79 Ex. A-1 at 108, 122. Tsien dated a radiation oncology summary note on June 6, 2002, in which she noted that plaintiff "was scheduled for his last cycle of chemotherapy as an inpatient." Doc. Ent. 79 Ex. A-1 at 108.

Plaintiff began his third course of chemotherapy on June 10, 2002. Doc. Ent. 49 ¶ 75. On June 10, 2002, Heisel performed an MRI of the neck, noting that "[t]he tumor involvement appears to have diminished by approximately 50%." Doc. Ent. 79 Ex. A-2 at 346.

Defendants claim that Kornak conducted a microlayngoscopy and biopsy of arachnoid and right false cord on June 13, 2002, and that "[n]o evidence of a tumor was found." Doc. Ent. 79 at 23.[8] On July 22, 2002, Tsien noted that plaintiff was "stable with no evidence of recurrent disease." Doc. Ent. 79 Ex. A-1 at 96. On August 27, 2002, Kornak did not "see any evidence of recurrence in the neck." Doc. Ent. 79 Ex. A-1 at 85. On September 30, 2002, Mathai noted that plaintiff's sore throat "has resolved completely." Doc. Ent. 79 Ex. A-1 at 19. On November 5,

_____

[8]Defendants claim evidence of this is attached at Doc. Ent. 79 Ex. A at 112. However, the record goes from 108 to 116.

2002, plaintiff saw Kornak, and he recommended a prompt follow-up biopsy and vocal cord stripping. Doc. Ent. 49 ¶ 79. On April 17, 2003, a biopsy and vocal cord stripping were performed, and the biopsy was negative. Doc. Ent. 49 ¶ 80.

2.      **As an initial matter, the Court should dismiss plaintiff's state law claims for gross negligence, reckless indifference, and willful and wanton misconduct.**

Plaintiff's December 13, 2004 amended complaint alleges claims of gross negligence, reckless indifference, and willful and wanton misconduct. Doc. Ent. 49 at ¶¶ 97-101. The CMS defendants argue that "[p]laintiff fails to state a claim against defendants Mathai and/or Hutchinson for negligence, gross negligence, 'Reckless indifference,' and/or willful and wanton misconduct, upon which relief may be granted[,]" because "[p]laintiff's claim sounds in medical malpractice, not ordinary negligence or gross negligence[,]" and "[t]here is no independent claim for 'reckless indifference' or 'willful and unwanton misconduct' separate from plaintiff's deliberate indifference claim upon which relief may be granted." Doc. Ent. 79 at 33-36.

In his response to the instant dispositive motion, plaintiff agrees that his state law negligence, gross negligence and willful and wanton misconduct claims "are subsumed under the medical malpractice statute and can be dismissed." Doc. Ent. 84 at 8 n.2. Therefore, the Court should enter an order dismissing these claims from plaintiff's December 13, 2004, amended complaint.

3.      **The Court should conclude that plaintiff's Eighth Amendment claims against the CMS defendants survive summary judgment.**

a.      Plaintiff's amended complaint also sets forth a 42 U.S.C. § 1983 claim based upon the Eighth Amendment. Doc. Ent. 49 at ¶¶ 87-96. Among other allegations, plaintiff contends that "[t]he defendant doctors demonstrated deliberate indifference by failing to diagnose [plaintiff's]

throat cancer within a reasonable time, by failing to confirm their suspicions (through laboratory tests) that he had cancer within a reasonable time, and, when [his] cancer was diagnosed, by failing to treat him within a reasonable time." Doc. Ent. 49 ¶ 88. Plaintiff alleges that "[e]ven after treatment, the defendant doctors demonstrated deliberate indifference by failing to test [plaintiff] for recurrence of his cancer within a reasonable time." Doc. Ent. 49 ¶ 89.

Plaintiff's amended complaint states that Hutchinson "helps to formulate and implement the customs, policies, practices and procedures, and staff training related to medical care in MDOC facilities." Doc. Ent. 49 ¶ 10. Within his claim of deliberate indifference, plaintiff alleges that "[t]he violation of [his] Eighth Amendment rights stemmed in part from the MDOC defendants and Hutchinson's customs, practices, procedures and policies that allowed or facilitated care that was deliberately indifferent, wanton, oppressive, or reckless." Doc. Ent. 49 ¶ 91. Plaintiff further alleges that "the defendants with the authority to create customs or policies failed to draft, promulgate, adopt, or enforce appropriate rules, regulations, procedures, orders, or protocols that could and should have prevented the acts of deliberate indifference committee against Mr. Broder, and that also could and should have prevented the injuries he suffered." Doc. Ent. 49 ¶ 92.

The CMS defendants argue that they "were not deliberately indifferent to plaintiff's serious medical needs, therefore, plaintiff's claim pursuant to 42 [U.S.C. §] 1983 must be dismissed pursuant to [Fed. R. Civ. P.] 56[,]" because "[t]here was no personal involvement by Dr. Hutchinson[,]" and "Dr. Mathai was not deliberately indifferent." Doc. Ent. 79 at 27-33.

**b.** With respect to Mathai, defendants argue that "[p]laintiff's claims amount to nothing more than a difference in medical opinion that his diagnosis of laryngeal cancer should have

occurred sooner, his specialty consultations completed sooner, and his cancer treatment initiated sooner[.]"  Defendants contend that plaintiff cannot satisfy the subjective component of an Eighth Amendment deliberate indifference claim, because "[t]here is not evidence that Dr. Mathai, being aware of Mr. Broder's laryngeal cancer, acted with deliberate indifference to its diagnosis, need for specialty consultations, and/or treatment."  Doc. Ent. 79 at 32.  Noting Williams's testimony that "I don't think [Mathai] intentionally withheld treatment in the sense of an explicit decision to withhold treatment she felt was indicated, she didn't do that[,]" and "she didn't make an explicit decision to bring harm to Mr. Broder[,]" Doc. Ent. 79-18 at 16, defendants contend that Mathai "did not act to intentionally delay Plaintiff's medical care and treatment for laryngeal cancer.  Plaintiff received excellent care, and is now cured, end of story." Doc. Ent. 79 at 33.

It is plaintiff's position that as of August 20, 2001, defendant Mathai "suspected that Mr. Broder had cancer."  Doc. Ent. 84 at 7.  With respect to that visit, Mathai testified: "I was wanting to make sure that his weight loss was not because of any underlying medical problem, any medical disease, so I ordered the basic chest x-ray and made sure he wasn't bleeding or, you know, colon cancer."  Ex. H at 48.  She was also concerned that plaintiff's weight loss might be the result of pulmonary disease such as TB or lung cancer.  Ex. H at 48-49.  Furthermore, the following was her reasons for giving plaintiff a rectal exam: "Because the patient hadn't had a rectal exam, and so I did one.  One of the things we look at in the rectal exam is to make sure that there are no masses present, there's no prostate problems and there's no blood in the stool. It will again indicate that if a patient had lost weight due to colon cancer, he would have had some blood in the stool or something.  It's a screening test for that."  Ex. H at 49.

Plaintiff's Eighth Amendment claim against Mathai is that "the failure of care was the fault of the PCP [Mathai] who failed to coordinate and to monitor his care, as well as the fault of the MDOC-CMS system, which all but guaranteed the late diagnosis and treatment." Doc. Ent. 84 at 7. Plaintiff claims that Mathai is "sued for what she did and what she did not do from the summer of 2001 to March 2002." Doc. Ent. 84 at 8.

Plaintiff contends that there are questions of fact. To begin, plaintiff contends that "[a] reasonable jury could find either (1) that Dr. Mathai did not suspect cancer and lied in her deposition to cover up her mistake - when in fact she only did a routine prostate exam and only ordered the chest x-ray because of Mr. Broder's high WBC count, or (2) that *if* Dr. Mathai suspected cancer, her failure to chart her suspicions, *and* her failure to procure the chest x-ray, *and* her failure to discover that the chest x-ray was never performed, *and* her failure to have a process in place to catch such a mistake if it occurred, all evidence deliberate indifference under the Eighth Amendment and/or medical negligence under state law." Doc. Ent. 84 at 11.

Also, in his August 18, 2001 letter, plaintiff mentioned two areas of concern which arose during his health screening - sinus drainage and a sore throat and drastic weight loss. Ex. E at 1. Plaintiff contends that "[a] reasonable jury could find that a patient who took the time to write down his symptoms two days before a visit to his PCP would describe those symptoms to her . . . despite the incomplete entry in the medical record." Doc. Ent. 84 at 12. Plaintiff also notes Norman's agreement that "[w]hen the information in that kite relates to the prisoner's medical condition, [he would] expect the information in the kite to make it into the medical record itself[.]" Ex. O at 44-45. However, plaintiff points out that the information from the August 31, 2001 kite was not added to the patient's medical record. Doc. Ent. 84 at 12. The August 31,

2001 entry states, "sore throat still, otherwise asymptomatic." Ex. C at 16, 22. Furthermore, plaintiff contends that "based on what Mr. Broder says he told his doctor, and based on the letter he wrote on 8/18/01, the kite he submitted on 8/31/01, the grievance of 8/31/01[,] and the follow-up clinic visits, a reasonable jury could find that Dr. Mathai had all the information she needed to make a differential diagnosis of throat cancer and to screen for it." Doc. Ent. 84 at 13.

Additionally, plaintiff contends that "[a] reasonable jury could find that as of 11/1/01, Dr. Mathai did not know that Mr. Broder was being evaluated for cancer, because she only looked at the chart in a cursory way. A reasonable jury could find that a doctor who knew that her patient had been 'urgently' referred to specialists for testing for throat or stomach cancer would not refer to the problem as 'currently being evaluated for weight loss' and would not list her sole follow-up task as repeating the routine lab work for the (unrelated) elevated white blood count." Doc .Ent. 84 at 15. Also, plaintiff contends that "a reasonable jury could find that [Mathai] was unaware for a time that Dr. Antonini had even ordered the tests[,]" and "[a] reasonable jury could find that by these acts and omissions Dr. Mathai violated Mr. Broder's right to be free from cruel and unusual punishment, and that she committed medical malpractice." Doc. Ent. 84 at 18.

Plaintiff argues that from October 12, 2001 (the date of plaintiff's appointment with Antonini) to January 11, 2002 (the date of plaintiff's microlaryngoscopy and cord stripping) Mathai did not do anything with CMS or specialists to accelerate plaintiff's appointments/results. Doc. Ent. 84 at 17. Mathai did sign Henderson's October 19, 2001 radiology report that "[n]o active pulmonary disease was seen[,]" and there was a "[s]mall sliding hiatal hernia." Ex. D at 12. She also signed the October 25, 2001 report of plaintiff's lab

results. Ex. D at 13. However, plaintiff notes that on November 13, 2001 the ENT ordered a biopsy to take place within 2-3 weeks, in other words by December 4, 2001. Mathai signed this request on November 14, 2001. Ex. D at 16, 22; Doc. Ent. 84 at 18. Furthermore, on November 16, 2001 she signed the November 14, 2001 report of plaintiff's lab results, and on November 20, 2001, she signed Kornak's November 13, 2001 clinic consultation. Ex. D at 17, 15. On November 29, 2001, she signed an offsite specialty referral 30 day followup form. Ex. D at 21. On December 12, 2001, Mathai signed the December 10, 2001 report of plaintiff's lab results. Ex. D at 23. On January 2, 2001 she signed another offsite speciality referral 30 day followup form. Ex. D at 24. Ultimately, the microlaryngoscopy with cord stripping did not take place until January 11, 2002.

In his argument specifically directed toward the Eighth Amendment claim against Mathai, plaintiff notes Williams's testimony that Mathai "signed many of [the documents], and yet the work up was proceeding at a snail's pace." Ex. M at 54. Also, plaintiff directs the Court's attention to Norman's testimony that he agreed "if the period of time for the scheduling exceeds what either the doctor thought was appropriate or what the specialist wrote was appropriate, then it remains incumbent upon the doctor to find out why there's a delay[.]" Doc. Ent. 86 Ex. O at 66. Furthermore, Pramstaller, over defense counsel's objection, agreed that it is "fair to say that it's the assigned doctor's job to make sure that the patient gets the treatment that the patient needs[.]" Doc. Ent. 85 Ex. F at 15. Additionally, Williams testified that "[i]n most primary care setting, [the primary responsibility for how follow-up care is scheduled and received] falls to the primary care provider." Doc. Ent. 85 Ex. M at 54. Plaintiff contends that

"[g]iven the system of patient care at [SMT] in 2001-02, a reasonable jury could find that only the PCP was in a position to coordinate and monitor [plaintiff's] care." Doc. Ent. 84 at 23.

The case law cited by plaintiff is also persuasive. Doc. Ent. 84 at 23-24. In support of his argument that "[w]here a doctor knows the nature and duration of the plaintiff's condition, and knows that the plaintiff requires medical attention, and fails to take steps to ensure timely diagnosis and treatment, the Eighth Amendment standard is met[,]" Doc. Ent. 84 at 23, plaintiff cites *Blackmore v. Kalamazoo County*, 390 F.3d 890, 896 (6th Cir. 2004);[9] *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991)[10] and *Parrish v. Johnson*, 800 F.2d 600, 610 (6th Cir. 1986).[11] Doc. Ent. 84 at 23-24.

---

[9] "[A] reasonable jury could conclude that Defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and the Defendants ignored that risk.'" *Blackmore v. Kalamazoo County*, 390 F.3d 890, 896 (6th Cir. 2004) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[W]here a plaintiff's claims arise from an injury or illness 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' *Gaudreault [v. Municipality of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990)], the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated." *Blackmore*, 390 F.3d at 900.

[10] "The fact that the wound did not become infected and healed properly does not indicate that plaintiff did not endure physical pain and mental anguish during the time he was denied any dressings for the wound or pain medication. This court has indicated that such suffering may constitute cruel and unusual punishment within the meaning of the Eighth Amendment." *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991).

[11] "The numerous types of tortious conduct and resultant injuries which the Eighth Amendment redresses militate heavily against our adopting an actual injury standard, because we simply cannot be certain that an actual injury requirement would be reflective of the common law or an appropriate prerequisite to obtaining damages in every situation." *Parrish v. Johnson*, 800 F.2d 600, 610 (6th Cir. 1986).

Furthermore, in support of his argument that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm[,]" plaintiff cites *Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834 (6th Cir. 2002).[12]  As plaintiff argues, "[i]t is hard to imagine a patient with a more obvious risk than Mr. Broder - a patient whose own doctor says that she thought he had cancer on [August 20, 2001], but who failed to get a confirmed diagnosis for five months, and failed to start treatment for 7 ½ months."  Doc. Ent. 84 at 24.

In light of the foregoing, the Court should agree with plaintiff that a reasonable jury could find that "Mathai thought that her patient had cancer but did not get him timely diagnosed or treated[,]" and that "the need for care was objectively obvious."  Doc. Ent. 84 at 25 (citing *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005) ("If an officer fails to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the Eighth or Fourteenth Amendments.")) (citations and quotations omitted).

**c.**    As to Hutchinson, defendants contend that, in addition to a lack of personal involvement, "[p]laintiff has never identified any official policy or procedure officially adopted by Dr. Hutchinson or any one else and relied on by one or more persons that resulted in harm to

---

[12] "'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  *Terrance*, 286 F.3d at 843 (6th Cir. 2002) (quoting Farmer, 511 U.S. at 842).  "'When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.'"  *Terrance*, 286 F.3d at 843-844 (citing *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir.1989)).

Plaintiff." Doc. Ent. 79 at 28-29. Defendants contend that each time plaintiff was referred for a specialty consultation, a timely request was sent to CMS, an appointment was scheduled and the consultation was completed. In other words, they argue, "Plaintiff has failed to show any specific policy of Dr. Hutchinson on behalf of himself or CMS that deprived Plaintiff of a constitutional right, or in deliberate indifference to a serious medical need." Doc. Ent. 79 at 29.

Plaintiff claims that Hutchinson is "sued because he was the medical director of the contract provider of health care services for all Michigan prisoners; at all relevant times he was responsible for the policies and practices governing Mr. Broder's care." Doc. Ent. 84 at 8.[13] In plaintiff's own words, "[t]he claim against Dr. Hutchinson is that the procedures at [SMF] in 2001-2002 were constitutionally deficient." Citing Mathai's discussion of the procedure involved with a CMS Authorization Request (a.k.a. 407), Ex. H at 72-75, plaintiff claims that "at every phase of the case - over and over again - it was impossible to get urgent care on time." Citing the December 7, 2006 *Hadix* findings of fact and conclusions of law, Ex. Q, plaintiff claims that follow up care required the same steps to be repeated. Doc. Ent. 84 at 28. Plaintiff also cites Mathai's deposition testimony, over defense counsel's objection, that during the period from April 1, 2001 to April 1, 2002, she did not recall the person scheduling the 407 appointments once approved by CMS consulting with her. Ex. H at 79, Doc. Ent. 84 at 28. Plaintiff claims that "[t]o get timely urgent care, the doctors had to take extra measures (like

---

[13]As plaintiff stated in his response, "Broder has treated the claim against Dr. Hutchinson as arising only under the Eighth Amendment, for constitutionally deficient policies and practices and/or training and supervision." Doc. Ent. 84 at 36 n.17. They further state that "a state law [medical malpractice] claim . . . arguably could not go forward as to [defendant Hutchinson], for lack of meeting that statutory requirement." Doc. Ent. 84 at 39 n.18.

personally calling the scheduling office), or had to violate protocol (like doing a test without approval and getting it after the fact)."

In the event nothing happened, plaintiff claims, "there were no procedures in place to catch and/or correct the problem. The only 'tickler' system was to re-schedule the patient for a clinic visit in 30-60 days. That meant that the problem typically would not come to the attention of the PCP until the time for results had long-since passed." Doc. Ent. 84 at 29. As Hutchinson testified "that's the way the system is set up, for every thirty day visits. If [the MSP] had elected to see [the patient] sooner than that [the MSP] would have had that ability. But the system is set up to bring the patient back every thirty days. And it's a one size fit all thirty days. It's not varying by the nature of the problem." Doc. Ent. 85 Ex. I at 76-77. Noting in part Tsien's testimony that "[a]s a primary treating physician concerning Mr. Broder's laryngeal cancer, . . . [she] can order the tests in a timely fashion and ensure that they're requested in a timely fashion, but [she] can't bring the patient to [her] office[,]" Ex. L at 19, plaintiff argues that "[a] reasonable jury could conclude that in 2001-02 the system for specialty care scheduling was dysfunctional, and that Dr. Hutchinson knew it and did nothing[.]" Doc. Ent. 84 at 30.

Another systemic problem, plaintiff argues, is that "none of the written information from the patient was recorded in a way to be of use to the PCP." Doc. Ent. 84 at 30. Again, plaintiff also notes Norman's agreement that "[w]hen the information in that kite relates to the prisoner's medical condition, [he would] expect the information in the kite to make it into the medical record itself[.]" Ex. O at 44-45. Furthermore, over defense counsel's objection, Norman stated that "[i]t could indicate a breakdown in that system[,]" "if the information that the patient has written into the request doesn't make it into the medical record and it's important information[.]"

Ex. O at 45.  According to plaintiff, "[n]o information from Mr. Broder ever found its way into his file, despite a steady stream of detailed kites [such as the health care requests dated August 31, 2001, January 28, 2002, February 4, 2002, February 25, 2002 and March 26, 2002], letters [such as those dated August 18, 2001 and September 23, 2001], and grievances all saying the same thing."  Therefore, plaintiff argues, "[a] reasonable jury could find that the kite system was also dysfunctional."  Doc. Ent. 84 at 31.

Furthermore, plaintiff argues that, citing the October 29, 2002 findings of fact and conclusions of law in the *Hadix* litigation, "[t]he delays in Mr. Broder's diagnosis and treatment were not aberrations, but were part of a systemic failure of care with which Dr. Hutchinson was all too well-acquainted."  Doc. Ent. 84 at 31-32.  Plaintiff contends that "[t]he *Hadix* court's findings of fact and conclusions of law are powerful evidence in support of Mr. Broder's claim that the delays in his case were proximately caused by flaws in the health care system."  Doc. Ent. 84 at 33.  Although Hutchinson stated in his May 11, 2005 deposition that "services are better and delivered more timely now[,]" Ex. I at 63, plaintiff contends that the December 7, 2006 findings of fact and conclusions of law in *Hadix* find "the *system* to be constitutionally deficient."  Doc. Ent. 84 at 33.  Plaintiff maintains that "[t]he *Hadix* case provides the strongest possible evidence, because it shows that Mr. Broder's late diagnosis and treatment were not isolated or aberrational events, and that Dr. Hutchinson had detailed knowledge of the system's shortcomings."  Doc. Ent. 84 at 33.  Specifically, plaintiff points to a paragraph from the *Hadix* court's December 7, 2006 findings of fact and conclusions of law on specialty care stating that "[b]oth the persuasive testimonies of Dr. Cohen and Dr. Walden demonstrate clearly and beyond peradventure that the specialty referral process is 'profoundly deficient.'" Ex. Q ¶ 110.

It is also worth mentioning Williams's opinion that the processes involved in this case were "[w]ay too slow." Doc. Ent. 84 at 23; Ex. M at 18. Plaintiff's arguments are persuasive. Therefore, the Court should agree that "where another federal district court has already concluded that the policies, procedures, and health care systems in place at [SMT] in 2001-02 violated the Eighth Amendment, this Court cannot grant summary judgment on the grounds that there is no genuine issue of material fact that they did not." Doc. Ent. 84 at 34.

**4.**    **The Court should conclude that plaintiff's negligence and medical malpractice claim against Mathai survive summary judgment.**

Plaintiff's claim of negligence and medical malpractice alleges defendants' duty (¶¶ 102-109), the standard of care (¶¶ 110-117), breaches (¶¶ 118-125) and damages (¶¶ 126-131). Doc. Ent. 49. As plaintiff has clarified, "Dr. Mathai is the only defendant against whom the [medical malpractice] claim runs." Doc. Ent. 84 at 36 n.17.

**a.**    **Defendants are not entitled to summary judgment on their procedural challenges to plaintiff's medical malpractice claim.**

**i.**    The CMS defendants argue that "[p]laintiff's amended complaint fails to state a claim of medical malpractice upon which relief may be granted and must be dismissed pursuant to [Fed. R. Civ. P.] 12(b)(6)[,]" because "[p]laintiff did not file an affidavit of merit[,]" "[p]laintiff's [NOI] . . . does not comply with [Mich. Comp. Laws §] 600.2912d[,]" "[p]laintiff's affidavits of merit fail to set forth the required elements in order to certify the merit of plaintiff's claims[,]" and "[p]laintiff's NOI and/or affidavit of merit fail to sufficiently specify the element of proximate cause pursuant to [Mich. Comp. Laws §] 600.2912b(4) and/or [Mich. Comp. Laws §] 600.2912d(1)(d)." Doc. Ent. 79 at 36-50.

**ii.**     Mich. Comp. Laws § 600.2912b governs, among other things, written notice

requirements in a medical malpractice action.  In pertinent part, the statute provides:

> The notice given to a health professional or health facility under this section shall
> contain a statement of at least all of the following:
>
> (a) The factual basis for the claim.
>
> (b) The applicable standard of practice or care alleged by the claimant.
>
> (c) The manner in which it is claimed that the applicable standard of practice or
> care was breached by the health professional or health facility.
>
> (d) The alleged action that should have been taken to achieve compliance with the
> alleged standard of practice or care.
>
> (e) The manner in which it is alleged the breach of the standard of practice or care
> was the proximate cause of the injury claimed in the notice.
>
> (f) The names of all health professionals and health facilities the claimant is
> notifying under this section in relation to the claim.

Mich. Comp. Laws § 600.2912b(4).

Mich. Comp. Laws § 600.2912d governs the duty of a plaintiff in a medical malpractice

action to furnish security or file an affidavit.  Specifically, it provides:

> . . . the plaintiff in an action alleging medical malpractice or, if the plaintiff is
> represented by an attorney, the plaintiff's attorney shall file with the complaint an
> affidavit of merit signed by a health professional who the plaintiff's attorney
> reasonably believes meets the requirements for an expert witness under section
> 2169.  The affidavit of merit shall certify that the health professional has reviewed
> the notice and all medical records supplied to him or her by the plaintiff's attorney
> concerning the allegations contained in the notice and shall contain a statement of
> each of the following:
>
> (a) The applicable standard of practice or care.
>
> (b) The health professional's opinion that the applicable standard of practice or
> care was breached by the health professional or health facility receiving the
> notice.

(c) The actions that should have been taken or omitted by the health professional or health facility in order to have complied with the applicable standard of practice or care.

(d) The manner in which the breach of the standard of practice or care was the proximate cause of the injury alleged in the notice.

Mich. Comp. Laws § 600.2912d(1) (footnote omitted).

**iii.** First, defendants argue that plaintiff did not file an affidavit of merit; therefore his claim for medical malpractice in Count III of the first amended complaint must be dismissed under Fed. R. Civ. P. 12(b)(6). Doc. Ent. 79 at 36-40. Affidavits of merit were filed on December 24, 2003, along with original complaint. Doc. Ent. 3 at 15-18 (Williams Dec. 9, 2003), 19-22 (Bradford Dec. 12, 2003). In part, defendants rely upon the unpublished cases of *DeMann v. Ottawa County Sheriff's Division*, 2001 U. S. Dist. LEXIS 19260 (W. D. Mich. Nov. 13, 2001)[14] and *Judd v. Heartland Health Care Center - Georgian East*, No. 01-CV-73837-DT, 2001 WL 1680124 (E. D. Mich. Dec. 21, 2001) (Duggan, J.).[15] Doc. Ent. 79 at 36.

Defendants argue that plaintiff should have filed an affidavit of merit with its amended complaint. In support of this argument, defendants primarily rely upon *Nippa v. Botsford General Hospital*, 251 Mich. App. 664, 651 N.W.2d 103 (2002), *vacated*, 468 Mich. 882, 661 N.W.2d 231 (2003), *remanded to* 257 Mich. App. 387, 668 N.W.2d 628 (2003), *appeal denied*, 469 Mich. 1005, 673 N.W.2d 747 (2004). In *Nippa*, the original complaint, filed against "Botsford General Hospital Group," was accompanied by an affidavit of merit; but the first

---

[14] "It is clear that plaintiff has not filed the required notice or affidavit of merit. Under Michigan law, the case against Dr. Rooks must therefore be dismissed without prejudice." *DeMann*, 2001 U. S. Dist. LEXIS 19260 at *10.

[15] "Plaintiff's complaint against Defendant must be dismissed for failure to file an affidavit of merit." *Judd*, 2001 WL 1680124 at *3.

amended complaint, filed against "Botsford General Hospital," and second amended complaints were not accompanied by affidavits of merit. *Nippa*, 251 Mich. App. at 665-666, 680.

Furthermore, defendants contend that plaintiff did not "adopt by reference any previously filed Affidavit of Merit." Doc. Ent. 79 at 40. In their December 30, 2004 affirmative defenses, defendants note that "[p]laintiff has not filed an affidavit of merit with the amended complaint in the manner required by MCL 600.2912b." Defendants' Doc. Ent. 50 at 45 ¶ 22. Relying upon *Scarsella v. Pollak*, 461 Mich. 547, 549; 607 N.W.2d 711 (2000)[16] and *Mouradian v. Goldberg*, 256 Mich. App. 566, 571 (2003), *overruled by Kirkaldy v. Rim*, 478 Mich. 581, 734 N.W.2d 201 (2007), defendants argue that plaintiff's December 13, 2004 amended complaint did not toll the statute of limitations, because it was not filed with an affidavit of merit. Therefore, defendants contend, the medical malpractice claim should be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6). Doc. Ent. 79 at 40.

Plaintiff responds that his "original complaint and affidavits of merit could not have been clearer that he intended a medical malpractice claim to run against his PCP for any delays in his diagnosis and treatment attributable to her." Doc. Ent. 84 at 34-36. Plaintiff notes that CMS was dismissed on September 22, 2004 as a defendant on the basis of the Eleventh Amendment, and the December 13, 2004 amended complaint "simply inserted Dr. Hutchinson's name wherever the name CMS, Inc., had appeared in the earlier version - in all other respects it was identical." Doc. Ent. 84 at 35. Plaintiff further notes that he "filed an affidavit of merit in

---

[16] "[F]or statute of limitations purposes in a medical malpractice case, the mere tendering of a complaint without the required affidavit of merit is insufficient to commence the lawsuit." *Scarsella*, 461 Mich. at 549, 607 N.W.2d at 713.

support of his original complaint as to her, and nothing in the amended complaint changed as to her."

Furthermore, there is evidence, as plaintiff points out, that Mathai knew about the nature of plaintiff's claims before the December 13, 2004 filing of the amended complaint. On March 18 and 25, 2004, affidavits of meritorious defense dated March 15 and March 18 were filed by non-parties Pedell and Norman, representing that they had reviewed the December 23, 2003 complaint. Doc. Entries 10 and 11. In Mathai and Antonini's October 18, 2004 answer, they rely on affidavits of meritorious defense by Norman and Pedell dated March 18, 2004 and March 16, 2004. Doc. Ent. 41 at 18. In Hutchinson, Antonini and Mathai's December 30, 2004 answer to plaintiff's first amended complaint, defendants adopted the affidavits of meritorious defense by Pedell and Norman which were dated March 18 , 2004, March 16, 2004 and October 29, 2004. Doc. Ent. 50 at 17.[17] Therefore, plaintiff contends, "Mathai and her attorneys clearly knew that she had been sued for medical malpractice, and that the core of Mr. Broder's claim was her delay in the diagnosis and treatment of his cancer." Doc. Ent. 84 at 35.

In support of his argument, plaintiff distinguishes *DeMann* and *Judd* as cases wherein an affidavit of merit was not filed with the original compliant.[18] Furthermore, plaintiff claims that in *Nippa* "the claim was dismissed because the plaintiff never filed an affidavit of merit from an

---

[17]Antonini, Hutchinson and Mathai also filed a "notice of filing reliance on affidavit of meritorious defense." Doc. Ent. 51.

[18]In *DeMann*, plaintiff filed the original complaint against the sheriff's department. The amended complaint added a claim of medical malpractice against a doctor. *DeMann*, 2001 U. S. Dist. LEXIS 19260, *1-*2. Nonetheless, the amended complaint in *DeMann* initiated the doctor as a defendant and medical malpractice as a claim.

appropriate specialist[.]" Doc. Ent. 84 at 35.  Instead, plaintiff relies upon *Derfiny v. Bouchard*,

128 F. Supp. 2d 450 (E. D. Mich. 2001).  Doc. Ent. 84 at 36.  Therein, Judge Tarnow stated:

> Unlike *Scarsella*, three valid affidavits of merit were filed in a related case
> subsequently consolidated with POH.  The related case derived from the same
> events, and the charge was based on the same action or inaction of POH
> physicians.  The defendants in the related case received timely affidavits of merit.
> These three affidavits of merit meet the requirements of M.C.L. § 600.2912(d).
> Further, the two cases were handled by the same attorney.  Thus, the affidavits
> were in the possession of the defendant well before the statute of limitations
> expired.  The affidavits stated that the doctor involved or the "health facility"
> breached the standard of care owed to the plaintiff.  These previously submitted
> affidavits distinguish this case from *Scarsella*.

*Derfiny*, 128 F.Supp.2d at 452-453.  After likening *Derfiny* to *VandenBerg v. VandenBurg*, 231

Mich. App. 497, 586 N.W.2d 570 (1998), Judge Tarnow noted:

> As in *VandenBerg*, the plaintiff in the present case had both the complaint and an
> affidavit of merit to the defendant prior to the running of the statute of limitations.
> In *VandenBerg*, the complaint was filed without an affidavit of merit, but the
> defendant was served an affidavit of merit at a later time. In the present case, the
> order is reversed.  The defendant was in possession of three affidavits of merit
> which named the "health facility" as a possible cause of the medical condition.
> Later, Derfiny filed the complaint naming POH as a defendant.  While the order is
> reversed, the effect in *VandenBerg* and the present case is the same:  a complaint
> and affidavit of merit notified the defendant that a non-frivolous medical
> malpractice claim was filed prior to the running of the statute of limitations, and
> there is no prejudice to the defendant.

*Derfiny*, 128 F. Supp. 2d at 453.  Judge Tarnow also found that "the intent of the legislature

[was] better served by not dismissing the claim against POH[,]" and "the statute should be

interpreted to encourage access to the courts."  *Derfiny*, 128 F. Supp. 2d at 453 (citing *Ericson v.

Pollack*, 110 F. Supp. 2d 582, 587-589 (E. D. Mich. 2000)).

Plaintiff's distinctions of *DeMann*, *Judd* and *Nippa*, as well as plaintiff's reliance upon

*Derfiny*, are persuasive.  Therefore, the Court should not dismiss plaintiff's medical malpractice

claim contained within the amended complaint on the basis that an affidavit of merit was not filed with it or that it did not contain a statement of reliance upon an affidavit of merit.

**iv.**     Second, defendants argue that plaintiff's NOI does not comply with Mich. Comp. Laws § 600.2912d. Doc. Ent. 79 at 40-44. Plaintiff's NOI was filed on April 29, 203. Doc. Ent. 79-12, Doc. Ent. 86 Ex. S. Defendants rely primarily upon *Roberts v. Mecosta County Hospital*, 470 Mich. 679, 684 N.W.2d 711 (2004). In *Roberts*, the Supreme Court of Michigan examined whether an NOI complied with § 2912b(4). *Roberts*, 470 Mich. at 687-700, 684 N.W.2d at 715-723. As to § 2912b(4)(b), the Court stated that the claimant is required to "make a good-faith effort to aver the specific standard of care that she is claiming to be applicable to each particular professional or facility that is named in the notice[,]" and noted that the NOIs "neither alleged a standard specifically applicable to the defendant facilities, nor did they serve as adequate notice to these defendants that plaintiff planned to proceed under a vicarious liability theory at trial." *Roberts*, 470 Mich. 691-692, 693; 684 N.W.2d at 718-719. As to § 2912b(4)(c), the Court stated that the claimant is required "to provide 'a statement' of each of the enumerated categories of information," and disagreed "with the panel's conclusion that the required information need not be 'separately . . . identified.'" *Roberts*, 470 Mich. at 696, 684 N.W.2d at 720. The Court noted that "[t]he notices fail to identify how the various defendants breached the applicable standards of care[,]" specifically stating:

> . . . the facts as set forth in the notices simply do not serve to notify defendants of the manner in which they breached their respective standard of care. The notices do not aver how plaintiff alleged her treatment by any defendant was deficient. There is no allegation, for example, that any of the defendants failed to perform critical tests, incorrectly diagnosed her condition, or failed to refer her to a specialist in keeping with the appropriate standard of care. Although, perhaps, an inference arises from the recitation of fact that plaintiff was alleging that one or more of the defendants should have earlier diagnosed an ectopic pregnancy, such

> an 'inference' is not sufficient to meet the statutory requirement that plaintiff
> provide a statement of the *manner* in which each defendant breached the
> applicable standard of case.

*Roberts*, 470 Mich. at 696-697; 684 N.W.2d at 721.  The Court stated that the statute expressly

requires "[a] good-faith effort on the part of a plaintiff to answer the statutory questions,

including the manner in which the plaintiff claims that the applicable standard of care was

breached."  *Roberts*, 470 Mich. at 697 n.15; 684 N.W.2d at 721.

Section B of the April 27, 2003 NOI, "The Applicable Standard of Care or Practice,"

purports to satisfy Section 600.2912b(4)(b).  Doc. Ent. 86-7 at 3.  Among other things, this

section of the NOI states:

> Investigation and diagnosis of invasive squamous cell carcinoma of the larynx
> should have happened 4-8 weeks following July 11, 2001, when Mr. Broder
> presented with refractory sore throat for several months combined with weight
> loss of over 20 pounds despite normal diet.  In any event, the time lapses . . . from
> the suspected diagnosis to the confirmed diagnosis, are outside the standard of
> care.
> Radiation or other curative treatment should have commenced within 3-6 weeks
> of initial diagnosis of Stage I laryngeal cancer.  Here it did not occur until 11
> weeks later . . . without explanation in the records.

*Id.*  Likewise, Section C of the NOI, "The Action That Should Have Been Taken To Achieve

Compliance With The Standard of Practice or Care," purports to satisfy Section 600.2912b(4)(d).

Doc. Ent. 86-7 at 4.  In a related fashion, this section of the NOI states:

> Mr. Broder's medical care providers should have recognized that he had
> symptoms of cancer as early as July, August, or September 2001.  Once
> [Antonini] suspected throat or gastrointestinal cancer on October 12, 2001, a
> positive diagnosis of Stage I laryngeal cancer by endoscopy and/or biopsy should
> have occurred within a few weeks; instead there was no confirmed diagnosis until
> 13+ weeks later[.]
> Following the positive lab results on January 14, 2002, treatment should have
> begun within 3-6 weeks; instead radiation and chemotherapy did not begin until
> April 2, 2002, a delay totaling 11 weeks from the confirmed diagnosis of the
> cancer.

*Id.*

To begin, defendants argue that plaintiff has not identified "a specific standard of practice or care applicable to each of the 17 different persons concerned in the NOI, including but not limited to Dr. Mathai, Dr. Antonini, Dr. Bey, Dr. Axelson, Dr. Hutchinson, or any other person." Nor, they claim, does the NOI plainly state the applicable standard. Doc. Ent. 79 at 42; Mich. Comp. Laws § 600.2912b(4)(b). The failure to state a cohesive standard care, defendants contend, make it "impossible for Defendants to discern which elements of the alleged standard apply to which Defendant(s)." Doc. Ent. 79 at 43. Specifically, defendants argue: "Plaintiff's alleged standard of care does not indicate whether Dr. Mathai should have investigated carcinoma of the larynx four to eight weeks after July 11, 2001. Additionally, the NOI fails to specify whether the commencement of radiation within three to six weeks is a standard that applies to Dr. Mathai or someone else. Likewise, it is unintelligible from Plaintiff's NOI whether continuous monitoring and provision of dental care is the standard applicable to Dr. Mathai or someone else." Doc. Ent. 79 at 43.

Also, defendants argue, "[p]laintiff's NOI is insufficient under [Mich. Comp. Laws §] 600.2912b(4)(c) as it fails to state 'the manner in which it is claimed that the applicable standard of practice or care was breached.'" Doc. Ent. 79 at 43. In other words, "the NOI does not indicate the manner in which any specific Defendant allegedly breached the standard of care." Doc. Ent. 79 at 43-44. For example, defendants contend, Section B of the NOI ("The Applicable Standard of Care or Practice"), "never alleges that any given physician Defendant's failure to complete any of the specified actions comprised a breach of the standard of care." Doc. Ent. 79 at 44. Furthermore, the NOI does not "specifically allege[] that the standard of care required any

individual Defendant physician to take any of the specific actions alleged." Doc. Ent. 79 at 44.

Defendants conclude that "[b]ecause [p]laintiff did not fulfill his obligation under § 2912b to set forth either the standard of care [subsection (b)] or the breach of that standard of care [subsection (c)] in order to put [d]efendants, Dr. Mathai or any other [d]efendant, properly on notice of his claims, the statute of limitations was not tolled during the notice period." Doc. Ent. 79 at 44.

Plaintiff responds that he has complied with Section 600.2912b(4). Doc. Ent. 84 at 37-39. In so doing, he relies upon *Boodt v. Borgess Medical Center*, 272 Mich. App. 621, 728 N.W.2d 471 (2006), wherein the Court of Appeals of Michigan considered "whether the notice [at issue] contain[ed] the required information, not whether any specific portion of the notice d[id]." *Boodt*, 272 Mich. App. 628, 728 N.W.2d at 476. Importantly, the court noted that "in *Roberts* the notice of intent simply did not contain the necessary information." *Id*. at 630, 728 N.W.2d at 477. The NOI in *Boodt* purported "to combine the requirements of MCL 600.2912b(4)(b), (c), and (d) into a single paragraph." *Id*. The Court of Appeals noted that "seven of the subparagraphs set forth specific actions that defendant allegedly failed to take, thereby breaching the applicable standard of care[,]" "[a]ny reader of the document could not help but become aware of the specific breaches being alleged against Dr. Lauer[,]" and "[t]hese seven subparagraphs satisfy the requirements of MCL 600.2912b(4)(b) and (c)." *Id*. The Court of Appeals noted that although the subparagraphs enumerated the actions that defendant did not take, "there is no reason to presume that a putative medical defendant would be forced to guess at the alleged standard of care, or at the actions he allegedly should have taken to comply with

the standard of care, from these negatively phrased statements." *Id*. at 631, 728 N.W.2d at 477-478. The court further stated: "In this case, no guesswork is required to appreciate that the standard of care is to have taken the actions that defendant allegedly failed to take. For the same reason, it is obvious that plaintiff alleges that defendant should have taken those actions in order to comply with the standard of care." *Boodt*, 272 Mich. App. at 631; 728 N.W.2d at 478. Also, "there is no real guesswork involved in coming to the conclusion that Dr. Lauer poked a hole in an artery, causing massive bleeding that was not stopped in time to prevent the decedent's death." *Id*. at 632, 728 N.W.2d at 478.

The NOI at issue in this case was sent to seventeen (17) individuals or entities, including Mathai. Doc. Ent. 86-7 at 5-6. Even if the NOI at issue does not specify "the specific standard of care that [he] *is claiming* to be applicable to each particular professional or facility that is named in the notice[,]" *Roberts*, 470 Mich. at 692, 684 N.W.2d at 718, at this point there is only one defendant, primary care physician Mathai, against whom the medical malpractice claim is brought. Doc. Ent. 84 at 38. As the above-quoted paragraphs illustrate, the NOI is clear that plaintiff's claim is based upon a delay in diagnosis and treatment of his laryngeal cancer. "[A] medical malpractice plaintiff is only obligated to provide defendants with notice of the claims against them at a presuit stage of the proceedings." *Boodt*, 272 Mich. App. at 632-633, 728 N.W.2d at 478. As plaintiff states, the NOI's "message to [Mathai] could not be clearer: that she failed to ensure that Mr. Broder was diagnosed and treated within a reasonable time." Likening his case to *Boodt*, plaintiff contends that "Mathai knew that she was the only primary care physician responsible for ensuring that Mr. Broder's cancer was timely diagnosed and treated." Doc. Ent. 84 at 38.

As to defendants' claim that the NOI is devoid of discussion of Section 600.2912b(4)(c), Doc. Ent. 79 at 43-44, Sections B and C of the April 27, 2003 NOI arguably embody the information sought by §§ 600.2912b(4)(b), (c) & (d). The above-quoted paragraphs mention the time periods during which the diagnosis and the initiation of treatment should have occurred and note the diagnosis and treatment happening outside of these periods. Although these requirements are not linked with a particular defendant, there is now only one defendant - Mathai - against whom the medical malpractice claim is brought, and the Court should agree with plaintiff that "[o]nce Mr. Broder described the malpractice as the delay in his diagnosis and treatment, then both the breach of duty and the corrective action were obvious - that Dr. Mathai should have coordinated and monitored his care to ensure *timely* diagnosis and treatment." Doc. Ent. 84 at 39.

**v.** Third, defendants argue that plaintiff's affidavits of merit do not contain the elements required by Section 600.2912d(1) to certify the merit of plaintiff's claims. Doc. Ent. 79 at 45-47. Defendants argue that Williams's December 9, 2003 affidavit of merit which was filed with the original complaint on December 24, 2003, does not "identify the medical standard of care applicable to each Defendant [600.2912d(1)(a)], the manner in which each breached the standard of care [600.2912d(1)(b)], and/or the actions each Defendant was required to take to comply with the standard of care [600.2912d(1)(c)][.]" Doc. Ent. 79 at 45. In support of this argument, defendants rely upon *Mouradian v. Goldberg*, 256 Mich. App. 566, 573-574 (2003) and *Geralds v. Munson Healthcare*, 259 Mich. App. 225, 235-240; 673 N.W.2d 792 (2003).

Defendants' brief specifically takes issue with the affidavit of merit's alleged deficiency with respect to Subsection (a), alleging the affidavits of merit "do not set forth the required

element of the standard of care." Defendants argue that the affidavits "completely fail to indicate any specific physician to whom Plaintiff is directing his claims[,]" and the affidavits "appear to allege that the same standard applies equally to a general practitioner, an internist, or any health care provider." Doc. Ent. 79 at 46. Defendants characterize the affidavits of merit as "simply lists of potential interventions that could be performed in treating a patient, not a cohesive standard of care delineating the proper practice as to any specific health care provider or Defendant." Doc. Ent. 79 at 46-47. Therefore, they argue, the affidavits do not certify plaintiff's claims. Doc. Ent. 79 at 47.

Furthermore, defendants contend that the failure to file an affidavit in compliance with Mich. Comp. Laws § 600.2912d resulted in plaintiff's failure to technically complete the filing of his complaint. Therefore, they argue, the medical malpractice claim should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to commence the claim before the two year statute of limitations expired. Doc. Ent. 79 at 47.

Plaintiff responds that "Mr. Broder's affidavits fully covered the statutory waterfront[.]" Doc. Ent. 79 at 39-40. In support of this argument, plaintiff cites the unpublished case of *Zemaitis v. Spectrum Health*, No. 265698, 2006 WL 890064 (Mich. App. Apr. 6, 2006), wherein the court stated that "MCL 600.2912d(1) does not provide that the 'statement' needs to be detailed or elaborate." *Zemaitis*, 2006 WL 890064, *4. The Court noted the parallel between the language of Sections 600.2912b(4)(e) and 600.2912d(1)(d). Quoting *Roberts v. Mecosta County Hospital*, 470 Mich. 679, 700-701, 648 N.W.2d 711 (2004), the Court of Appeals noted that "'[u]nder MCL 600.2912b(4), a medical malpractice claimant is required to provide potential defendants with notice that includes a 'statement' of each of the statutorily enumerated

categories of information. Although it is reasonable to expect that some of the particulars of the information supplied by the claimant will evolve as discovery and litigation proceed, the claimant is required to make good-faith averments that provide details that are responsive to the information sought by the statute and that are as particularized as is consistent with the early notice stage of the proceedings. The information in the [NOI] must be set forth with that degree of specificity which will put the potential defendants on notice as to the nature of the claim against them. This is not an onerous task: all the claimant must do is specify what it is that she is claiming under each of the enumerated categories in § 2912b(4).'" *Id.* at \*4. "The affidavit of merit stage of the proceedings is at the inception of the litigation, and there likewise has been no discovery; therefore, the information available and to be communicated is also somewhat limited." *Id.* at \*5. *See also Boodt*, 272 Mich. App. at 626, 728 N.W.2d at 475 ("The expected level of specificity must be considered in light of the fact that discovery would not yet have begun.").

The Court should not grant summary judgment on the basis that plaintiff's affidavits of merit do not comply with Section 600.2912d. First, Section 600.2912d(1)(a) requires a statement of the applicable standard of practice or care. Paragraph 3 of Williams's December 9, 2003 affidavit and paragraph 4 of Bradford's December 12, 2003 affidavit purport to satisfy this subsection of the statute. Doc. Ent. 3 at 15-17, 20. The subsections of these paragraphs discuss what a reasonable general practitioner, internist, or health care provider, and in some cases what a reasonable ENT specialist, would have done. As plaintiff notes in his response, "[a]t present, the only remaining defendant [against whom a medical malpractice claim is brought] is Dr. Mathai, and since she was a general practitioner, internist, or health care provider - and since she

knew that she was the primary care physician - it is hard to see how she could possibly have been confused about what the plaintiff was alleging that she did wrong, or what she should have done in order not to be negligent." Doc. Ent. 84 at 40; Mich. Comp. Laws § 600.2912d(1)(b), (c).

Second, on July 11, 2007, the Supreme Court of Michigan overruled *Mouradian* and *Geralds* in *Kirkaldy v. Rim*, 478 Mich. 581; 734 N.W.2d 201 (2007), wherein the court stated, "a complaint and affidavit of merit toll the period of limitations until the validity of the affidavit is successfully challenged in 'subsequent judicial proceedings.' Only a successful challenge will cause the affidavit to lose its presumption of validity and cause the period of limitations to resume running." *Kirkaldy*, 734 N.W.2d at 203. Therefore, until the affidavits of merit are successfully challenged, the period of limitations is tolled.[19]

**vi.** Fourth, defendants argue that plaintiff's NOI and/or affidavit of merit do not adequately set forth proximate cause as required by Sections 600.2912b(4)(e) and/or 600.2912d(1)(d). Doc. Ent. 79 at 47-50. Section D of the NOI purports to satisfy Section 600.2912b(4)(e). Doc. Ent. 86-7 at 4-5. In *Roberts*, the Supreme Court of Michigan stated that "it is not sufficient under [§ 2912b(4)(e)] to merely state that defendants' alleged negligence caused an injury. Rather, § 2912b(4)(e) requires that a notice of intent more precisely contain a statement as to the manner in which it is alleged that the breach was a proximate cause of the injury." *Roberts*, 470 Mich. at

---

[19]Plaintiff suggests that defendants are engaging in gamesmanship with the timing of these procedural arguments. "The defense at any time could have moved to dismiss based on the same alleged deficiencies, if it believed them to be meritorious. Instead, the defense waited until all the discovery was done – at considerable expense to everyone – and makes the motion now only because dismissal will time-bar the plaintiff's med-mal claim." Doc. Ent. 84 at 40 n.19.

*700 n.16, 648 N.W.2d at 722 n.16. Citing this portion of *Roberts*, defendants claim that plaintiff's NOI "does not contain a statement as to the manner in which it is alleged that the breach was a proximate cause of Plaintiff's injury[.]" Doc. Ent. 79 at 48.

Defendants contend that Williams's affidavit of merit does not satisfy Mich. Comp. Laws 600.2912d(1)(d). Doc. Ent. 79 at 50. Paragraph 5 of Williams's affidavit of merit purports to satisfy Section 600.2912d(1)(d):

> Mr. Broder suffered the following injuries as the proximate result of the acts and omissions that were outside the standard of care:
>
> a.  Long-term sore throat, weight loss, loss of voice, and difficulty swallowing for months longer than was necessary;
> b.  Progression of his cancer from Stage I to Stage III T2N1, lowering his statistical life expectancy;
> c.  Three courses of chemotherapy with all attendant side effects, including the insertion of a PEG tube and subsequent infection, as well as possible long-term dental problems, all of which were avoidable because Stage I laryngeal cancer is treatable by radiation alone;
> d.  Physical pain an suffering, mental anxiety, and emotional anguish because of the complications and side effects of the additional treatments needed to remedy his Stage III laryngeal cancer and because of the uncertainty caused by the delays in diagnosis, treatment, follow-up, and the increased risk of recurrence.

Doc. Ent. 3 at 18 ¶ 5. Defendants rely upon the unpublished case of *Bailey v. Pornpichit*, No. 267546, 2006 WL 2270400 (Mich. App. Aug. 8, 2006). Doc. Ent. 79 at 47-49. In *Bailey*, the affidavit of merit stated with regard to proximate cause that "as a direct result of [the doctor's] failure to comply with the applicable standard of care, . . . Christal Bailey was delivered stillborn." Bailey, 2006 WL 2270400, *2. The Court stated:

> The mere correlation between alleged malpractice and an injury is insufficient to show proximate cause. Proximate cause is a legal term of art that incorporates both cause in fact and legal (proximate) cause. The cause in fact element generally requires showing that but for the defendant's actions, the plaintiff's injury would not have occurred. Legal (proximate) cause normally involves

examining the foreseeability of consequences and whether a defendant should be held legally responsible for such consequences.

> In this case, plaintiff's affidavit describing the matter of proximate cause simply states "[t]hat as a direct result of Dr. [Sethavarangura's] failure to comply with the applicable standard of care, as outlined above, Christal Bailey was delivered stillborn." The standard of care "outlined above" consisted of performing tests. Presumably, if defendant had performed the tests and learned of Christal Bailey's fetal distress, then defendant possibly could have done something to save her. But the affidavit does not describe the manner in which defendant's failure to perform the tests factually and foreseeably caused Christal Bailey to be stillborn. It is possible that, even had defendant performed the tests, Christal Bailey still could have been stillborn. Therefore, we find that plaintiff's affidavit of merit was insufficient to satisfy MCL 600.2912d(1)(d).

*Bailey*, 2006 WL 2270400, *2 (internal citations omitted).  Likening this case to *Bailey*, defendants contend that Williams's affidavit of merit "does not describe the manner in which Defendant's alleged failure to monitor Plaintiff 'factually and **forseeably**' caused Plaintiff []to suffer prolonged as alleged."  Defendants note the possibility that "even had Defendant monitored Plaintiff [more closely], Plaintiff's testing and treatment would not have occurred sooner in light of the opinions and schedules of the various consulting specialists utilized, and the nature of plaintiff's cancer."  Doc. Ent. 79 at 49.

Plaintiff distinguishes *Roberts* and *Bailey* by stating that "in both those cases the precise question was *how* the defendants caused the alleged harm."  Doc. Ent. 84 at 40.  In *Roberts*, the notice of intent to the hospital contained a section regarding "THE MANNER IN WHICH THE BREACH WAS THE PROXIMATE CAUSE OF CLAIMED INJURY", in other words the section purporting to satisfy Section 2912b(4)(e), stated "[s]ee paragraph 2 above."  *Roberts*, 470 Mich. at 688, 684 N.W.2d at 716.  Paragraph 2 was the section regarding "THE APPLICABLE STANDARD OF PRACTICE OR CARE ALLEGED", and it stated:

> Claimant contends that the applicable standard of care required that Mecosta County General Hospital provide the claimant with the services of competent, qualified and licensed staff of physicians, residents, interns, nurses and other employees to properly care for her, render competent advice and assistance in the care and treatment of her case and to render same in accordance with the applicable standard of care.

*Roberts*, 470 Mich. at 687, 684 N.W.2d at 716. Another notice of intent to the professional group, two of its individual affiliates and the emergency room physician contained similar paragraphs. Id. at 689, 684 N.W.2d 711 at 717. With respect to Section 600.2912b(4)(e), the Court stated, "[n]owhere in the notices does plaintiff state that any of the defendants misdiagnosed her condition; nor do the notices state any consequences stemming from a misdiagnosis." *Id.* at 699, 684 N.W.2d at 722. In *Bailey*, an additional inference needed to be made - for example, "if defendant had performed the tests and learned of Christal Bailey's fetal distress, then defendant possibly could have done something to save her." *Bailey*, 2006 WL 2270400, *2.

Plaintiff argues that his case is different, and this Court should agree. As plaintiff states, "the proximate harm he alleges was having to endure the pain and suffering of his symptoms for far longer than he should have had to endure them, and having to undergo more invasive treatment than otherwise would have been necessary." Doc. Ent. 84 at 40-41. For example, Section D of the NOI states that "[t]he delays in diagnosis . . . were the cause of continuous pain, anxiety, and deteriorating physical well-being for Mr. Broder[,]" and "[c]omplications caused by Mr. Broder's undiagnosed and late-treated cancer included pain, difficulty in eating, [etc.][.]" Doc. Ent. 86-7 at 4-5. Furthermore, Paragraph 5 of Williams's affidavit of merit lists injuries "as the proximate result of the acts and omissions that were outside the standard of care[,]" such as difficulty swallowing, progression of his cancer, subjection to chemotherapy, etc. Doc. Ent. 3 at

18.  To be clear, Paragraph 4 of the affidavit contained the alleged acts and omission, such as plaintiff "should have been given laboratory tests . .. Within two to four weeks of November 13, 2001[,]" and he "should have begun treatment no later than two to four weeks after the diagnosis of Stage I laryngeal cancer."  Doc. Ent. 3 at 17.  As plaintiff argues, "[w]hen the alleged negligence is the failure to timely diagnose and treat, and the proximate harm is the suffering caused as a result, there can be no 'extra step' or 'extra proof' required because the causal connection is direct."

**b.    Defendants are not entitled to summary judgment on their claim that plaintiff has not complied with Section 600.2912a(2).**

Defendants also argue that plaintiff has not complied with Mich. Comp. Laws § 600.2912a(2)'s foreseeability requirement.  Doc. Ent. 79 at 49-50.  Mich. Comp. Laws § 600.2912a provides in part that "[i]n an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants.  In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%."  Mich. Comp. Laws § 600.2912a(2).

Defendants argue that "there is no evidence Plaintiff's cancer ever progressed from Stage I to III as alleged by Plaintiff, or that more invasive treatment was required as a result of any alleged delay."  Doc. Ent. 79 at 49.  Defendants note that plaintiff "was cured of his cancer. There is no evidence that his opportunity to achieve a better result was decreased by greater than 50% as a result of Dr. Mathai's alleged medical malpractice."  Doc. Ent. 79 at 50.

Plaintiff notes that his NOI and affidavits of merit allege that "as a result of the delays, his cancer progressed from Stage I to Stage III." Doc. Ent. 84 at 41. To begin, the NOI states that "[t]he 11-week delay in treatment following the diagnosis resulted in the progression of Mr. Broder's laryngeal cancer from Stage I, with an expected >90 percent chance of survival for 5 years following a moderate course of therapy (typically, radiation alone) to Stage III T2N1. Because his Stage I laryngeal cancer was allowed to progress untreated, Mr. Broder has a 34-60 percent chance of survival for 5 years, even following an aggressive course of treatment." Doc. Ent. 86-7 at 4-5. Also, as previously mentioned, Williams's affidavit of merit states that the proximate result of acts and omissions outside the standard of care included "[p]rogress of [plaintiff's] cancer from Stage I to Stage III T2N1, lowering [plaintiff's] statistical life expectancy[.]" Doc. Ent. 3 at 18. Furthermore, Hayman testified that the advanced condition was not present when he saw plaintiff on February 5, 2002. Doc. Ent. 85-16 at 5. Additionally, Bradford testified that plaintiff's cancer was at Stage I as of mid-January and progressed to Stage III sometime between January and March. Doc. Ent. 85-19 at 72-73.

Plaintiff cannot recover for loss of opportunity to survive based on allegations that delay in diagnosis or treatment reduced his chances for long-term survival - he "can only recover for a present injury, not for a potential future injury." *Wickens v. Oakwood Healthcare System*, 465 Mich. 53, 60, 631 N.W.2d 686, 690 (2001). As the Supreme Court of Michigan has stated:

> Plaintiff claims that a living plaintiff who suffers a reduction in chances of long-term survival because of medical malpractice may have a cause of action for loss of an opportunity to survive under the statute. The testimony that plaintiff's chances of surviving for a [five]-year period decreased, however, is evidence of a *potential future injury*-death-which is not an injury *already suffered*, as required by the plain language of the statute. Thus, a loss of an opportunity to survive claim only encompasses injuries already suffered, which clearly limits recovery to situations where death has already occurred. Because the evidence concerning the

reduction in h[is] chances of survival over a [five]-year period is relevant *only* to h[is] potential, future death, the living plaintiff in this case may not recover for this "loss of opportunity."

*Wickens*, 465 Mich. at 60-61, 631 N.W.2d at 690 (emphasis in original).

However, plaintiff may proceed on a claim that he suffered other injuries as a result of delayed diagnosis and treatment: "[t]he [five]-year-survival-rate statistics say nothing about plaintiff's chances of avoiding the *other* injuries [he] allegedly suffered, such as (1) the more invasive medical treatments caused by the . . . delay in [his] diagnosis, (2) the emotional trauma attributable to [his] unnecessarily worsened physical condition, and (3) the pain and suffering attributable to [his] unnecessarily worsened physical condition. Because of these alleged injuries, the trial court should not have dismissed plaintiff's case in its entirety on the basis of subsection 2912a(2)." *Id*. at 61-62, 631 N.W.2d at 691 (emphasis in original).

To the extent that plaintiff's medical malpractice claim is based upon other injuries he suffered as a result of delayed diagnosis and treatment, the Court should conclude that his claim survives summary judgment. Hayman testified: "[t]he fact that at the time of simulation [March 12, 2002] he was found to have more advanced disease than was initially felt to be the case and that he went on to have treatment with chemotherapy in addition to radiation." Doc. Ent 86-15 at 5. Furthermore, Bradford's report states, "had Mr. Broder been timely tested for throat cancer following his appointment on August 20, 2001, and had he been timely treated, it is more likely than not that radiation therapy alone would have been sufficient." Doc. Ent. 84-4 ¶ 87. Additionally, Bradford testified that the complications and side effects of additional treatments included the PEG tube that got infected, difficulty swallowing, anxiety, permanent loss of saliva and the need for dental care. Ex. N. at 85, 85-88. Based upon these documents, there is a

question of material fact regarding damages. As plaintiff contends, his "damage claim is not just that he had to undergo chemotherapy that could have been avoided, but also that the wider field of radiation (to treat Stage III cancer) caused added damage to his throat, voice-box, and salivary glands." Doc. Ent. 84 at 42 n.20.

**c.      Defendants are not entitled to summary judgment on their substantive challenge to plaintiff's medical malpractice claim.**

**i.**      Plaintiff argues that, because Mathai's conduct evidenced deliberate indifference, it "necessarily include[d] negligence." Doc. Ent. 84 at 25-28. In his deposition, Dr. Williams stated that Mathai "missed the diagnosis[,]" and "[o]nce it was suspected, she did nothing to facilitate Mr. Broder's getting care in a timely manner." Doc. Ent. 85 Ex. M at 39. Furthermore, when Dr. Norman was asked, "assuming [Mathai] was concerned that the client might have cancer. And at this point she identifies in her own mind two kinds of cancer that could cause the symptoms that have been reported, how soon should she have an answer as to whether or not the patient has cancer to be within the standard of care[,]" over defense counsel's objection Norman stated: "I would say certainly within a matter of days you would expect, just because of the nature of the procedure. It's not that complicated to do." Doc. Ent. 86 Ex. O at 37-38.

Additionally, Dr. Pramstaller testified that assuming Mathai performed the rectal exam, prostate exam, CBC and chest x-ray because she thought plaintiff might have cancer, two or three weeks would have been an appropriate amount of time for plaintiff to have his chest x-ray results back. Doc. Ent. 85 Ex. F at 36. Dr. Pramstaller also testified, over defense counsel's objection, that he believed it was "the assigned doctor's job to make sure that the patient gets the treatment that the patient needs[.]" Doc. Ent. 85 Ex. F at 15. Dr. Norman testified that the procedures ordered by Dr. Antonini would be expected to have been done within four to six

52

weeks. Doc. Ent. 86 Ex. O at 52. When asked "how long should you wait from October 12th to know whether [plaintiff] has cancer or not?", Dr. Pramstaller testified that "the longest that [he] would be comfortable with would be eight weeks." Doc. Ent. 85 Ex. F at 53. He also suggested that Mathai might have monitored Kornak's November 2001 request "through a tickler file that they keep themselves of patients they want to follow up on, or they can just walk into the other room where the CMS coordinator is and take a look at the off-site specialty book which should give you up-to-date information on that." Doc. Ent. 85 Ex. F at 65.

Over defense counsel's objection based upon speculation, Williams testified that Mathai signing the 30 day follow up form "moves the diagnostic procedure well past the time window recommended by the subspecialist, so she should not do so without consulting with the subspecialist." Doc. Ent. 85 Ex. M at 96-97. Related testimony surfaced during Dr. Pramstaller's deposition:

> Q:    Is it appropriate at this point for her to sign a 30-day deferral form? [Objections omitted.]
> . . .
> A:    If I was reviewing this case, I would have questions as to whether or not it was appropriate, and I probably would talk to her about it.
> Q:    If we look at the second form, this one is now dated January 2 – it says '01, but I'm assuming it's '02, and you should assume that it's '02. Here we've got the same thing now, not November 29th, but 34 days later, 33 days later, and again she said it's acceptable to continue to wait completion of the off-site. She checked yes. If it was a problem on November 29th, is it a significantly greater problem on January 2nd? [Objection(s) omitted].
> A:    I would have more concern over it, yes.

Doc. Ent. 85 Ex. F at 68-69.

Williams testified that "[i]n a system as complex as this, if something gets dropped like the timeliness or the accomplishment of a CT scan, the primary care provider shares some

responsibility in seeing that it gets done regardless of what other factors are in play." Doc. Ent. 85 Ex. M at 85.

**ii.**	Defendants argue that "[d]efendant Dr. Mathai is entitled to summary judgment concerning plaintiff's medical malpractice claim pursuant to [Fed. R. Civ. P.] 56 because plaintiff's experts admit there was no delay by Dr. Mathai." Doc. Ent. 79 at 50-53. To the extent plaintiff's claim against Mathai concerns delay in the diagnosis of plaintiff's laryngeal cancer, defendants claim it is without factual support. Doc. Ent. 79 at 50. Defendants contend that Williams "admitted during his testimony there is no evidence of these symptoms during the time period in question, between March through August 2001." Doc. Ent. 79 at 51 (citing examples from Doc. Ent. 84 Ex. M at 41-44, 52). Defendants contend that "[g]iven the lack of information observed by Dr. Mathai concerning the conditions required to diagnose Plaintiff's laryngeal cancer, Plaintiff's claim that Dr. Mathai did not timely diagnose or suspect Plaintiff's laryngeal cancer must be dismissed." Doc. Ent. 79 at 51 (citing Doc. Ent. 84 Ex. M at 30-53).

To the extent plaintiff's claim against Mathai concerns facilitating plaintiff's care and treating his cancer from the time it was suspected by Antonini on October 12, 2001, the CMS defendants contend that because Mathai was away on vacation from October 1, 2001 through October 21, 2001, and because she was on maternity leave from March 9, 2002 through May 15, 2002, "the only remaining dates at issue concerning Dr. Mathai are between October 21, 2002 through March 9, 2002." Doc. Ent. 79 at 51-52 (citing Doc. Ent. 84 Ex. M at 45, 80). Defendants characterize Williams's testimony as Mathai "timely follow[ing] the recommendations of the treating consulting cancer and oncology specialists." Doc. Ent. 79 at 52 (citing examples from Doc. Ent. 84 Ex. M at 20-21, 54-77). Defendants contend that "Mathai

did not breach the applicable medical standard of practice and care under the present circumstances." Doc. Ent. 79 at 53.

**iii.** Plaintiff responds that the opinions and conclusions in Williams's report are confirmed by his testimony. Doc. Ent. 84 at 42-43, Doc. Ent. 85 Ex. A at 9-11. Significantly, the report supports plaintiff's statement that "after the ENT saw Mr. Broder on 11/13/01, Dr. Mathai approved 30-day delays [on November 29, 2001 and January 2, 2002] that extended the earliest date for a confirmed diagnosis far beyond the 2-3 weeks that the ENT had requested [on November 13, 2001][.]" Doc. Ent. 84 at 42-43. Doc. Ent. 85 Ex. A at 10 ¶¶ 79, 80. Furthermore, the report specifically states, "[b]y any measure, the delay in diagnosis far exceeds the standard of care in any setting in southeast Michigan." Doc. Ent. 85 Ex. A at 10 ¶ 81.

Also, Williamson's report states that "[b]y any measure, the delay in treatment in this case after the confirmed diagnosis of throat cancer [on January 22, 2002] far exceeds the standard of care in any setting in southeast Michigan." Doc. Ent. 85 Ex. A at 11 ¶ 83. It further states that "[e]xcept for the phone call on January 30, 2002, the medical records do not show any other action by Dr. Mathai to ensure that Mr. Broder's treatment would begin in a timely fashion, after the diagnosis in mid-January 2002." Doc. Ent. 85 Ex. A at 11 ¶ 84. Identical paragraphs appear in the June 13, 2006 report on Broder by Dr. Carol R. Bradford. Doc. Ent. 85 Ex. B at 11 ¶¶ 79, 80, 81, 83, 84.[20]

---

[20]Plaintiff contends that "whether or not Dr. Mathai was the responsible physician, or whether or not the late diagnosis and treatment resulted in added pain and suffering" are "jury questions that have nothing to do with the framing of proximate cause in the notice of intent or in the affidavit of merit." Doc. Ent. 84 at 41.

**iv.**      Taking the above into consideration, the Court should agree with plaintiff that "a reasonable jury could find that Dr. Williams's testimony fully supports a claim of medical malpractice."  Doc. Ent. 84 at 43.  As previously noted, Williams testified that Mathai "missed the diagnosis[,]" and "[o]nce it was suspected, she did nothing to facilitate Mr. Broder's getting care in a timely manner."  Doc. Ent. 85 Ex. M at 39.  Furthermore, as noted above, Williams testified about the 30 day follow up form, when read with Pramstaller's testimony, begs the question of whether Mathai should have agreed on November 29, 2001 and on January 2, 2002 that it was acceptable to continue to await completion of the vocal cord stripping.  Doc. Ent. 85 Ex. D at 21, 24.

**III.**      <u>**NOTICE TO PARTIES REGARDING OBJECTIONS**</u>:

      The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505, 508-09 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).  Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995); *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
Dated 8/29/07                    UNITED STATES MAGISTRATE JUDGE

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on August 29, 2007.

s/Eddrey Butts
Case Manager